No. 91-532

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

JACK S. DALTON,

        Plaintiff and Appellant,

-vs-

KALISPELL REGIONAL HOSPITAL,

        Defendant and Respondent.

FILED

JAN 2 9 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

     Randy K. Dix, Dix & Hunt Law Firm, Helena, Montana

     For Respondent:

     Stephen C. Berg, Warden, Christiansen, Johnson &
Berg, Kalispell, Montana

Submitted on Briefs:   June 25, 1992

Decided:   January 29, 1993

Filed:

_____
Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Jack S. Dalton appeals from the grant of summary judgment in favor of Kalispell Regional Hospital by the First Judicial District Court, Lewis and Clark County. We affirm.

The following issues are presented on appeal:

1. Did the District Court err in requiring expert opinion testimony regarding standards of hospital care?

2. Did the District Court err in refusing to apply the doctrine of res ipsa loquitur?

The facts of this case relating to liability are not in dispute. Appellant Dalton was a patient of Dr. J. T. Laidlaw (Laidlaw), an orthopedic surgeon in Kalispell. Laidlaw determined that Dalton's right hip should be replaced with a prosthetic device and decided to use the Harris-Galante I.

Laidlaw met with a representative of Zimmer-Jackson Associates, Inc. (ZJA), a company which markets prosthetic devices, on approximately September 12, 1986, to determine the proper device for Dalton's surgery. It was determined that large sizes in the cups and reamers of the prosthetic device would be needed. The ZJA representative ordered the Harris-Galante I kit with oversized cups and reamers by telephone the same day.

Laidlaw's office personnel called the operating room at Kalispell Regional Hospital (Hospital) on September 12, to reserve surgery time for Dalton's operation on October 2, 1986. Operating room personnel were advised that the surgery would be a right total

2

hip replacement using the Harris-Galante I kit from ZJA. No reference to the need for large cups and reamers in the kit was made during this telephone call. Following its usual procedure, the Hospital then issued a confirming purchase order for the device.

The kit arrived at the Hospital the evening preceding the surgery. An operating room nurse inventoried the kit, checking each item against the packing list. No procedure existed by which the Hospital verified that the shipment received was the shipment actually ordered by the physician from the manufacturer.

After the surgery had begun, Laidlaw asked the nurse for a large reamer. It was discovered at that time that the kit did not contain the larger cups and reamers which had been ordered. After further inquiry, it became clear that the only kit which had been shipped by ZJA was that inventoried by the nurse; it contained only the standard size cups and reamers.

Laidlaw decided to close Dalton's incision and terminate the surgery until the proper prosthetic device could be utilized. ZJA shipped the properly sized device later the same day. Dalton's hip was replaced with the newly delivered device the following day.

The Hospital subsequently changed its procedure regarding verification of prosthetic devices ordered by physicians. In February, 1987, it instituted a procedure whereby the nurse assigned to the surgery checks the prosthetic device received and informs the physician if discrepancies between the special order requisition information and the shipment invoice are found.

3

Dalton filed a complaint against ZJA, Laidlaw and the Hospital. Settlements subsequently were entered into between both ZJA and Laidlaw and Dalton.

The Hospital moved for summary judgment asserting that Dalton had failed to name an expert witness who would testify as to the duty owed by the Hospital and a breach of that duty. Dalton admitted that he did not intend to produce expert opinion testimony regarding standards of hospital care. He contended that expert testimony was not required because the Hospital's negligence is obvious and, indeed, admitted. He also argued that the doctrine of res ipsa loquitur applies to this case, eliminating the need for expert testimony.

On September 5, 1991, the District Court entered its memorandum and order granting summary judgment in favor of the Hospital unless Dalton named a witness who would testify as to standard of care by October 1, 1991. No such witness having been named, judgment was entered against Dalton on October 4, 1991. This appeal followed.

Did the District Court err in requiring expert opinion testimony regarding standards of hospital care?

The District Court determined that, while exceptions exist to the general rule in malpractice actions that the standard of care must be established by expert testimony, the exceptions are not applicable in this case. Specifically, the court determined that the Hospital's change in procedure several months after Dalton's surgery did not establish its standard of care in October, 1986.

4

The court concluded that the standard of care in this case was not something readily ascertainable by laypeople.

Dalton argues, first, that the Hospital's duty to provide that which is necessary to perform surgery properly is not a matter requiring expert testimony. He relies on Montana Deaconess Hospital v. Gratton (1976), 169 Mont. 185, 545 P.2d 670, where we acknowledged an exception to the usual requirement of establishing a medical standard of care via expert testimony when the conduct complained of is readily ascertainable by a layperson.

We did recognize the exception cited by Dalton in Gratton. We refused, however, to apply that exception in Gratton, which involved the management of a staph infection following an open reduction surgery of a leg fracture, concluding that the cause of an infection is not readily ascertainable by a layperson. We similarly decline to apply the exception here.

The essence of Dalton's argument is that the Hospital's failure to take any action to determine the suitability of the prosthetic device, or to have any procedure in place to do so, is ample evidence from which a jury can reasonably infer negligence. We disagree. The Hospital's lack of action is evidence of the Hospital's lack of action and nothing more. As we stated in Gratton, "[w]hat is missing here is evidence of any standard of care against which the acts or omissions of the . . . hospital staff can be measured to establish negligence. . . . " Gratton, 169 Mont. at 188, 189.

Dalton also argues that the Hospital's own admissions of

5

record bring the present case within the ambit of our cases holding that expert testimony in medical negligence cases is not required if a defendant's own evidence establishes a standard of care and a deviation from that standard. He asserts that the Hospital's evidence that it had no "checks and balances" in place in October, 1986, to ensure proper sizing and inventory of prosthetic devices and that, subsequent to the events at issue here, it inaugurated such procedures, establishes what the Hospital knew to be the applicable standard of care in October, 1986. In short, according to Dalton, no policy during the first pertinent time frame followed by a policy in the second equals an admission of an applicable standard of care during the first time frame. Aside from any questions regarding admissibility of evidence of the after-inaugurated procedure under the "remedial measures" provision of Rule 407, M.R.Evid., which we do not address here, we find this contention unpersuasive.

We have recognized the "defendant's admissions" exception to the expert testimony requirement in several cases. In both Hunter v. Missoula Community Hospital (1988), 230 Mont. 300, 750 P.2d 106, and Hill v. Squibb (1979), 181 Mont. 199, 592 P.2d 1383, we acknowledged, but refused to apply, the exception.

In Thomas v. Merriam (1959), 135 Mont. 121, 337 P.2d 604, a physician testified to the standard of care. The defendant physician was deceased by the time of trial; however, his admissions to a member of the plaintiff patient's family as to the procedure he followed were sufficient to establish a deviation from

6

the standard of care.

The case before us is distinguishable from <u>Thomas</u>. As discussed above, <u>Thomas</u> involved a defendant's admissions of the procedures he followed. Independent expert testimony established the standard of care against which the defendant's admissions could be measured. Here, the Hospital's "admissions" regarding its policies and procedures are matters of fact equivalent to the defendant physician's in <u>Thomas</u>. Absent expert testimony establishing the standard of care, however, there is nothing against which the Hospital's admissions can be measured. Thus, there is no way for a jury to determine whether or not the Hospital's procedures in October, 1986, constituted a deviation from the applicable standard.

Dalton's assertions that the policy instituted by the Hospital in February, 1987, establishes the applicable standard of care either at that time or during October, 1986, ring no less hollow for the frequency with which they are repeated. This is not an appropriate case for application of the "defendant's admissions" exception to the general rule requiring expert testimony to establish the standard of care in medical negligence cases.

We hold the District Court did not err in requiring expert opinion testimony regarding standards of hospital care.

Did the District Court err in refusing to apply the doctrine of <u>res ipsa loquitur</u>?

The District Court determined that the doctrine of <u>res ipsa loquitur</u> is not applicable here in that, under these facts, it

7

cannot be said that the prosthetic device was under the Hospital's exclusive control. The court also noted that application of the doctrine does not shift a plaintiff's burden of making a prima facie case of breach of a duty of care in a medical negligence case.

Dalton is correct in asserting that res ipsa loquitur may be applicable in certain malpractice cases in Montana. But his res ipsa loquitur argument is, to a large extent, merely an extension of his other arguments for not being required to produce an expert witness to establish a standard of care. It is here that this argument misses the mark.

Where applicable, the doctrine of res ipsa loquitur "permits proof of what happened to be made by circumstantial evidence. . . ." Clark v. Norris (1987), 226 Mont. 43, 48, 734 P.2d 182, 185. The doctrine, if applicable in a medical malpractice case, does not permit a presumption of negligence; a plaintiff still "must make a prima facie case that defendant breached a duty of care before the question goes to the jury." Id. In the case before us, Dalton does not seek application of res ipsa loquitur for purposes of proving what happened by circumstantial evidence; what happened is clear and undisputed. Rather, he seeks application of the doctrine in order to avoid producing the expert testimony required to establish a prima facie case of duty of care and breach thereof. Under Clark, this is an inappropriate application of res ipsa loquitur.

Furthermore, we agree with the District Court that the

8

"exclusive control" element of <u>res</u> <u>ipsa</u> <u>loquitur</u> is not met under these facts. The instrumentality, if considered to be the improperly sized prosthetic device, was not under the exclusive control of the Hospital at the time of the injury. If the "instrumentality" is considered to be the communication or lack thereof—between Laidlaw, ZJA and the Hospital—it was never in the exclusive control of the Hospital. Therefore, we conclude that the doctrine of <u>res</u> <u>ipsa</u> <u>loquitur</u> is not applicable to the case before us; the District Court did not err in refusing to apply it.

Affirmed.

_Karla M. Gray_
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

9

Justice Terry N. Trieweiler, concurring in part and dissenting in part.

I concur with that part of the majority opinion which holds that the doctrine of res ipsa loquitur is not applicable to the facts in this case. I dissent from that part of the majority opinion which holds that expert testimony was necessary to establish the negligence of Kalispell Regional Hospital.

The majority correctly notes that in Montana we have recognized an exception to the usual requirement of expert testimony to prove a medical standard of care when the conduct complained of is readily ascertainable by a lay person. There are no cases in Montana where that exception has been applied. However, when we look to other jurisdictions which have applied the exception it is clear that it should be applied to the facts in this case.

For example, in *McKnight v. St. Francis Hospital, Etc.* (Kan. 1978), 585 P.2d 984, the issue was also whether inter-hospital communication had been adequate. In that case, plaintiff, an elderly lady, was admitted to the hospital by her physician with the diagnosis of hypertension, heart cardiovascular disease and a mild cerebral accident on the left side. She was in an extremely weak condition and her physician prescribed x-ray examination. That procedure required that a requisition form be filled out by a nurse who was employed by the hospital. That form provided a space for her history but no information pertaining to the plaintiff's diagnosis or condition was provided. She was taken to the radiology

10

department where she collapsed during a vertical x-ray exam because she was not provided with assistance to stand erect. The plaintiff contended, and the trial court agreed, that the hospital's failure to advise the radiology department of the plaintiff's weakened condition and history was the proximate cause of her fall and resulting injury. However, on appeal, the defendant contended that the plaintiff had a duty to present expert testimony regarding the hospital's duty of care and that it did not do so. Of particular relevance to this case was the hospital's contention that:

> The plaintiff did not present expert testimony that there is a duty to include this type of information on the X-ray requisition form or that the defendant hospital violated any duty in failing to provide the radiology department with such information.

*McKnight*, 585 P.2d at 985.

However, on appeal, the Supreme Court of Kansas set forth a more complete explanation of the "common knowledge" exception to the rule requiring expert testimony in malpractice cases and held that expert testimony was not required in that case. In discussing the rule the court in *McKnight* stated:

> There is a common knowledge exception to the rule requiring expert medical testimony in malpractice cases. This common knowledge exception applies if what is alleged to have occurred in the diagnosis, treatment, and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally. *Webb v. Lungstrum*, 223 Kan. 487 . . . 575 P.2d 22 (1978).

> This "common knowledge exception" was stated in a different manner in *Hiatt* as follows:

> "Expert medical testimony is ordinarily required to establish negligence on the part

11

of either a physician or a hospital in their care and treatment of a patient, unless the medical procedures employed are so patently bad that negligence or lack of skill is manifest to a lay observer or other acts complained of could be regarded as negligent by applying the common knowledge and experience of mankind."

. . .

The common knowledge exception to the rule requiring expert testimony in malpractice cases was applicable in the case at hand. . . .

*McKnight*, 585 P.2d at 986-87. In accord is *Washington Hospital Center v. Butler* (U.S. App.D.C. 1967), 384 F.2d. 331.

As in the *McKnight* case the issue in this case was whether the information included in the hospital's internal requisition form provided sufficient safeguards to the plaintiff.

Marilyn Meyers was the circulating nurse in charge of Kalispell Regional Hospital's operating room who ordered the plaintiff's prosthesis. She filled out the order form which was sent to the purchasing department which placed the order with the company which manufactured the prosthesis. However, nowhere in the purchasing form was the size of the prosthesis indicated even though she acknowledged that the prosthesis came in various sizes.

Jayne Wangerin was the scrub nurse whose responsibility it was to gather the instruments and supplies that would be necessary for plaintiff's surgery and bring them to the operating room. When plaintiff's prosthesis arrived the day before or the morning of his operation, she checked the contents of the container in which it was shipped against the information on the packing slip which was

12

sent with the package. She also checked the contents against the manufacturer's catalog which indicated those parts that should come with that prosthesis. However, at no time did she determine from either Doctor Laidlaw, from Marilyn Meyers or from the purchasing department what the appropriate size of the prosthesis should be.

The hospital acknowledged by the procedure that it employed that some inspection of what was sent by the manufacturer was necessary. The people who checked what was sent also acknowledged that the prosthetic device that was received comes in various sizes. With this information it does not require an expert to conclude that any meaningful inspection would have to determine whether the appropriate size was sent. Expert testimony should not be necessary to establish that the hospital was negligent when it failed to consider whether the parts shipped were the appropriate size until the plaintiff lay on the operating table with an open incision.

It does not take a rocket scientist to figure out that if it is reasonable to inspect prosthetic devices that are shipped to the hospital; if an important characteristic of the prosthetic device is its size; and if the operating physician relies on confirmation that the appropriate prosthetic device has been sent before he opens up a patient for implantation of that device, then a reasonable inspection should include a determination that the correct size has been received.

Just as in the cited cases, this case involves an internal communication at the hospital in the form of a requisition sheet

13

which did not include adequate information and therefore communications within the hospital were inadequate to assure the plaintiff's safety. That fact can be deduced from the common knowledge possessed by lay people and does not require expert testimony for its proof.

For these reasons, I dissent from the majority opinion. I would reverse the summary judgment of the District Court and remand this case to the District Court for a trial to determine whether or not Kalispell Regional Hospital was negligent when it purchased the wrong sized prosthetic device for implantation into the patient's hip and did not let his treating physician know until after plaintiff's surgery had begun.

_____
Justice